IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

KAREN NICOLE SMITH,

    Plaintiff,

v.                                               Civil Action No. 2:11-CV-32

MICHAEL ASTRUE,
Commissioner of Social Security,

    Defendant.

# REPORT AND RECOMMENDATION
# THAT CLAIMANT'S MOTION FOR SUMMARY JUDGMENT BE DENIED

## I. Introduction

A.     <u>Background</u>

Plaintiff, Karen Nicole Smith, ("Claimant"), filed her Complaint on April 19, 2011, seeking judicial review pursuant to 42 U.S.C. §§ 405(g) of an adverse decision by Defendant, Commissioner of Social Security ("Commissioner").[1] Commissioner filed his Answer on June 21, 2011.[2] Claimant filed her Motion for Summary Judgment on August 1, 2011.[3] Commissioner filed his Motion for Summary Judgment on August 29, 2011.[4]

B.     <u>The Pleadings</u>

    1.     Claimant's Motion for Summary Judgment & Memorandum in Support

    2.     Commissioner's Motion for Summary Judgment & Memorandum in Support

---

[1] Docket No. 1.

[2] Docket No. 6.

[3] Docket No. 12.

[4] Docket No. 14.

C.   Recommendation

I recommend that:

1.   Claimant's Motion for Summary Judgment be **DENIED** because the Administrative Law Judge's ("ALJ") determination that Claimant had sufficient residual functional capacity to return to her past work as a secretary or bookkeeper and his determination that statements regarding her symptoms were not credible are supported by substantial evidence.

2.   Commissioner's Motion for Summary Judgment be **GRANTED** for the same reasons set forth above.

## II.  Facts

A.   Procedural History

Claimant filed an application for Disability Insurance Benefits on September 25, 2007, alleging disability since December 31, 2002. (Tr. 134). The application was initially denied on November 27, 2007 and on reconsideration on February 19, 2008. (Tr. 88-89, 101). Claimant requested a hearing before an ALJ and received a hearing on February 24, 2009 in Morgantown, West Virginia. (Tr. 27).

On June 11, 2009, the ALJ issued a decision adverse to Claimant finding that she was not under a disability within the meaning of sections 216(I) and 223(d) of the Social Security Act through March 31, 2005, the last date insured, and that during the relevant time period, Claimant retained the residual functional capacity to perform light exertional work that required no high production rates or quotas; no more than occasional contact with co-workers, supervisors, or the general public; and permitted for a fifteen minute break in the morning and afternoon and, if caught up on work, an additional ten minute break in the morning and afternoon, with no more

than five breaks in an eight-hour day. (Tr. 16-18, 159). The ALJ also found that her residual functional capacity would not have prevented her from performing her past work as a secretary or bookkeeper. (Tr. 22). Claimant requested review by the Appeals Council but was denied. (Tr. 1, 10). Claimant filed this action, which proceeded as set forth above, having exhausted her administrative remedies.

B.	Personal History

Claimant was born on February 3, 1970, and was thirty-nine years old on the date of the February 24, 2009 hearing before the ALJ. (Tr. 34). Claimant completed high school and one semester of college courses at Marshall University in 1988. (Tr. 41, 175). Claimant has had prior on-the-job training as a scrub nurse (Tr. 41), and has work experience as a surgical technician, a nursing assistant at a nursing home, an assistant secretary, a loan officer, a bank teller supervisor, a babysitter, a cook at a summer camp, a telemarketer, a waitress, and as a warranty operations clerk at a freight company. (Tr. 48, 50, 52, 74, 177, 213).

C.	Medical History

The following medical history is relevant to the issue of whether substantial evidence supports the ALJ's finding that the Claimant could perform the requirements of her past relevant work and to the issue of whether her testimony regarding her symptoms lacked credibility:

Between October 26, 1999 and December 30, 2002, the day before her alleged onset date, Claimant was seen numerous times by Dr. Trenbath, her family physician, for migraines. (Tr. 302). In addition to seeing her family physician during that time period, on July 4, 2001, Claimant went to the Summersville Memorial Hospital emergency room for dizziness and nausea, and was diagnosed by Dr. Mac G. Bailes with labyrinthitis and a migraine. (Tr. 513-16).

3

On May 1, 2002, Claimant went to the Webster County ER with a migraine that had lasted between four and five days. (Tr. 358). On May 13, 2002, Claimant again went to the Webster County ER with a migraine headache. (Tr. 355). On August 14, 2002, after going to the Webster County Memorial Hospital ER, Claimant had a CT of her head that came out unremarkable. (Tr. 333). On November 6, 2002, Claimant went to the Summersville Memorial Hospital ER for a headache that had been going on for the past seven days and was given a 75 mg. injection of demerol, a 50 mg. injection of phenergan and a 60 mg. injection of toradol. (Tr. 509-11).

When Claimant again sought out Dr. Trenbath on December 31, 2002, the onset date Claimant claims, he concluded that her migraines were associated with menstruation, and he prescribed her depo-provera. (Tr. 302). She was also given injections of demerol and phenergan to ease her pain and nausea. (Tr. 275). Sometime after being prescribed the depo-provera medication, Claimant stopped taking the medicine because of weight gain (Tr. 61, 301) and because of her fear of developing osteoporosis due to bone mineral density loss that can be triggered by the drug. (Tr. 283, 287)..

Plaintiff returned to the Camden-on-Gauley Medical Center on February 11, 2003 with a migraine and got a referral for neurologist to treat her migraines. (Tr. 274). On February 26, 2003, Dr. Jack Riggs, a neurologist at West Virginia University, performed cervical spine, thoracic spine, and lumbosacral spine examinations of Claimant. (Tr. 257). His examination of her cervical spine which showed no stenosis, preservation of height and density of cervical vertebral bodies, and that the C1-C2 and C7-T1 junctions were aligned, although there were mild degenerative changes seen from the C4-C7 level. (Tr. 257). Her thoracic spine examination showed evidence of osteopenia and mild compression deformities of the T6 and T7 vetebral

4

bodies. (Tr. 259). Her lumbosacral spine examination showed mild fact degenerative changes seen in the lumbar spine region. (Tr. 261). Dr. Riggs then placed Claimant on 800 mg. of ibuprofen three times per day instead of vicodin. (Tr. 249-50).

On June 1, 2003, Claimant went to the Webster County Memorial Hospital ER for a migraine that had lasted over two days. (Tr. 338-42). She was prescribed toradol, demerol, and phenergan and told to return to the ER as needed. (Tr. 342).

Starting in July 2003, Claimant began having difficulty urinating. She had kidney stones in July and October 2003. (TR. 334, 336-37, 378-79, 384, 386). On July 28, 2003, Claimant had a KUB abdominal x-ray which showed her bowel gas pattern was normal. (Tr. 401). On August 21, 2003, Plaintiff contacted the Medical Center to ask for a maxalt prescription because although she thought she had her migraines under control, she was going through another. (Tr. 270).

On September 9, 2003, Claimant went to the Webster Clinic for a migraine and was given demerol and phenergan. (Tr. 316). On October 23, 2003, Claimant had an intravenous pyelogram (IVP) to detect abnormalities in the urinary system, resulting in an impression of normal kidneys, ureters, and bladder. (Tr. 400). Again on October 24, 2003, she went to the ER to see about kidney stone pain control. (Tr. 379). On October 27, 2003, after being evaluated by Dr. Domingo Chua, she was diagnosed with gross hematuria. (Tr. 263). Dr. Chua performed a cytoscope in order to determine whether Claimant had interstitial cystitis, which is a chronic bladder disorder characterized by urinary frequency, urinary urgency, and pelvic pain, although no definitive diagnosis was made at that point. (Tr. 263). Then, on October 28, 3003, Dr. Tan performed a pelvic ultrasound and concluded that Claimant had a retroverted uterus and no

5

adnexal masses. (Tr. 399). On October 30, 2003, Plaintiff was examined by Dr. Kassis, who diagnosed her with hemorrhagic cystitis and a bladder infection, and gave her macrobid, macrodantin and urimax (Tr. 648).

In 2004, Claimant became pregnant and her migraines eased during that time, although she still had moderate hydronephrosis in her kidneys. (Tr. 59, 429, 465).

On July 12, 2005 and July 26, 2005, Claimant went to the ER with migraines (Tr. 373-74). After her July 26 visit, she was referred to Dr. Lassere. (Tr. 373). On September 12, 2005, Dr. Lassere diagnosed her with dyeria, painful urination. (Tr. 445). On September 14, 2005, Dr. Lassere performed a laparoscopically assisted vaginal hysterectomy, which lessened the intensity of her migraines, although they were still occurring once or twice per week. (Tr. 59-60, 446). During that procedure, her OB/GYN diagnosed her with interstitial cystitis. (Tr. 446). On September 22, September 30, October 7, October 13, and October 19, 2005, Claimant received bladder instillations from Dr. Lassere. (Tr. 407-10).

In 2006, Claimant went the ER at Summersville Memorial Hospital due to a bladder spasm and blood in her urine, although a CT showed no kidney stone. (Tr. 432-34). On September 19, 2006, Claimant went to Hope Medical Center with the chief complaint of a migraine. (Tr. 529).

In 2007, Claimant was hospitalized twice for bi-polar disorder, suicidal thoughts, anxiety and depression (Tr. 170, 171, 517, 538, 608), and, in a letter from her nurse practitioner, it was mentioned that she may have had depression since 2002. (Tr. 647). She also sought treatment for dysuria, urinary problems and other migraine headaches in 2007. (Tr. 519, 521, 571).

D.  Testimonial Evidence

Testimony was taken at the hearing held on February 24, 2009. The following portions of the testimony are relevant to the disposition of the case:

Claimant testified that while dealing with severe migraines, she was attempting to work as a dispatcher and bookkeeper for her uncle, who is a self-employed tractor trailer driver. (Tr. 42). Her job was to use the phone from her home to locate loads for their trips and she also did the bill keeping for her uncle. (Tr. 43-44). However, Claimant testified that she stopped working for her uncle in 2002 because she "wasn't able to keep up" (Tr. 45), and because the "migraines, vomiting, light sensitivity, sound sensitivity, smell sensitivity, put me to bed." (Tr. 58). She testified that "[she] wasn't able to keep up with the billing and that's why they weren't getting paid." (Tr. 45).

Claimant also testified that from February 2004 and to March 2005 she worked at a daycare center. (Tr. 38). Claimant testified that she has problems keeping a job because of "the dependability factor." (Tr. 58). She stated that she "cannot be counted on to be there five days a week, x amount of hours a day." (Tr. 53). She also testified that her frequent need to use the restroom created a problem in keeping the right ratio of staff to children in the room at all times. (Tr. 67).

Claimant testified about the trouble her medical conditions have created for her in taking care of her children. She said that she has to "have help with [her] own children still today because when the migraines flare up or when [she has] to be hospitalized, [she has] to have someone else come in and care for [her] own children because [she] is unable to do it." (Tr. 53). "They usually either stay at the house or they take my children to their home." (Tr. 60).

Claimant testified about her manic phases. She stated that while in a manic phase "you

7

feel like you can take on the world. You are in high gear. You are in high speed. You don't sleep. You don't eat. You are very irritable." (Tr. 61). She continued that "[she] find[s] herself taking on responsibilities and projects that [she] realize[s] that [she] probably [is] not going to be able to follow through with and she usually end[s] up having to pass them on to someone else or resign..." (Tr. 61-62). When asked how often she recalled having feelings like this, she replied that "sometimes it would be a daily cycle up and down." (Tr. 62).

Claimant also testified to the frequency of her urination. She stated that the longest she can last between bathroom breaks is an hour and "[she's] usually in a lot of pain if [she] wait[s] that long." (Tr. 66). Between her arrival at the hearing office at approximately 1:25 p.m. the afternoon of the hearing and by 3:10, she had to make three visits to the restroom. (Tr. 66). She said that "when [she] urinate[s], [her] bladder spasms which continues long after the urination is over." (Tr. 66). However, she testified that since she has been on Elmiron the frequency that she feels the need to urinate has decreased. (Tr. 67).

The vocational expert testified that if the claimant was limited to doing medium work in jobs that do nor require high production rates or more than occasional contact with co-workers, supervisors and the general public, she would still be able to perform her past relevant work as a secretary or bookkeeper. (Tr. 76). However, he testified that if she had the additional limitation of needing to use the restroom once an hour outside of normal breaks, she would not be able to perform any of her past relevant work because it would be too disruptive. (Tr. 76). He went on to testify that a hypothetical individual with those traits and limitations could work as a: photographic machine operator; folding machine operator; copy examiner; or as an assembler of printed products in the local economy, among others. (Tr. 78). If that hypothetical person was

8

off-task two hours each day for bathroom use or for other reasons, or if that individual was absent from work three days each month on an ongoing basis, that person would not be able to participate in the local or national economy. (Tr. 79).

E.   Lifestyle Evidence

The following evidence concerning the Claimant's lifestyle was obtained at the hearing and through medical records. The information is included in the report to demonstrate how the Claimant's alleged impairments affect her daily life.

Claimant is married and has three children, including, at the time of the hearing, a four year old son, a thirteen year old daughter, and a nineteen year old son. (Tr. 35). During the period in question, her husband was traveling five to six days a week, so she was primarily responsible for taking care of the children. (Tr. 19). She usually gets up with the kids for school, sometimes does housework, and sometimes cooks or prepares things like sandwiches or frozen dinners (Tr. 185, 187). Sometimes she gets dressed in the mornings, but sometimes stays in her pyjamas. (Tr. 186). She also takes care of the family's four beagles along with her husband and son. (Tr. 186).

Claimant has a driver's license and typically uses the car four to five days a week. (Tr. 37). She was an assistant Girl Scout leader in 2001 or 2002 and became the group leader the following year for a total of up to forty-five Girl Scouts. (Tr. 63).

### III.  The Motions for Summary Judgment

A.   Contentions of the Parties

Claimant contends that the ALJ's decision regarding her residual functional capacity is not supported by substantial evidence. Claimant's brief alleges two instances of error on the

9

ALJ's part: 1) the ALJ erred in failing to determine Claimant's ability to work on a regular and continuous basis as required by the Commissioner's regulations; 2) the ALJ erred in his determination that Claimant's statements about her symptoms are not credible.

Commissioner contends the ALJ's decision is supported by substantial evidence and should therefore be affirmed. Specifically, Commissioner responds that 1) the ALJ reasonably accounted for Claimant's limitations arising from her bladder impairment when assessing her residual functional capacity and 2) the ALJ reasonably found that Claimant's subjective complaints of pain and functional limitations were not credible

B.   The Standards.

   1.   Summary Judgment. Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment bears the initial burden of showing the absence of any issues of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). All inferences must be viewed in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). However, "a party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of [the] pleading, but...must set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986).

   2.   Judicial Review. Only a final determination of the Commissioner may receive judicial review. See, 42 U.S.C. §405(g), (h); Adams v. Heckler, 799 F.2d 131,133 (4th Cir.

1986).

3.  <u>Social Security - Medically Determinable Impairment - Burden</u>. Claimant bears the burden of showing that she has a medically determinable impairment that is so severe that it prevents her from engaging in any substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(1), (d)(2)(A); <u>Heckler v. Campbell</u>, 461 U.S. 458, 460 (1983).

4.  <u>Social Security - Medically Determinable Impairment</u>. The Social Security Act requires that an impairment, physical or mental, be demonstrated by medically acceptable clinical or laboratory diagnostic techniques. 42 U.S.C. § 423(d)(1), (3); <u>Throckmorton v. U.S. Dep't of Health and Human Servs.</u>, 932 F.2d 295, 297 n.1 (4th Cir. 1990); 20 C.F.R. §§ 404.1508, 416.908.

5.  <u>Disability Prior to Expiration of Insured Status- Burden</u>. In order to receive disability insurance benefits, an applicant must establish that she was disabled before the expiration of her insured status. <u>Highland v. Apfel</u>, 149 F.3d 873, 876 (8th Cir. 1998) (citing 42 U.S.C. §§ 416(I), 423(c); <u>Stephens v. Shalala</u>, 46 F.3d 37, 39 (8th Cir.1995)).

6.  <u>Social Security - Standard of Review</u>. It is the duty of the ALJ, not the courts, to make findings of fact and to resolve conflicts in the evidence. The scope of review is limited to determining whether the findings of the Secretary are supported by substantial evidence and whether the correct law was applied, not to substitute the Court's judgment for that of the Secretary. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990).

7.  <u>Social Security - Scope of Review - Weight Given to Relevant Evidence</u>. The Court must address whether the ALJ has analyzed all of the relevant evidence and sufficiently explained his rationale in crediting certain evidence in conducting the "substantial evidence

11

inquiry." Milburn Colliery Co. v. Hicks, 138 F.3d 524, 528 (4th Cir. 1998). The Court cannot determine if findings are unsupported by substantial evidence unless the Secretary explicitly indicates the weight given to all of the relevant evidence. Gordon v. Schweiker, 725 F.2d 231, 235-36 (4th Cir. 1984).

        8.      Social Security - Substantial Evidence - Defined. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Substantial evidence consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996) (citations omitted).

        9.      Social Security - Sequential Analysis. To determine whether Claimant is disabled, the Secretary must follow the sequential analysis in 20 C.F.R. §§ 404.1520, 416.920, and determine: 1) whether claimant is currently employed, 2) whether she has a severe impairment, 3) whether her impairment meets or equals one listed by the Secretary, 4) whether the claimant can perform her past work; and 5) whether the claimant is capable of performing any work in the national economy. Once claimant satisfies Steps One and Two, she will automatically be found disabled if she suffers from a listed impairment. If the claimant does not have listed impairments but cannot perform her past work, the burden shifts to the Secretary to show that the claimant can perform some other job. Rhoderick v. Heckler, 737 F.2d 714-15 (7th Cir. 1984).

C.     Discussion

        1.      Whether the ALJ Erred in Determining Claimant's Physical Residual Functional Capacity.

Claimant alleges the ALJ's conclusion that she could perform a range of activity that "requires no more than a 'light' level of physical exertion; requires no high production rates or

quotas (i.e. assembly lime of high sales work); involves no more than occasional contact with co-workers, supervisors and the general public; and allows for a 15 minute break in the morning and afternoon and if caught up with work an additional 10 minute break in the morning and afternoon, with no more than five breaks in an 8 hour workday" was in error. (TR. 18). More specifically, Claimant alleges the ALJ, in determining her RFC, erred because he did not address her ability to perform work on a regular and continuous basis (Pl's Mot. Summ. J. 10), including how often she would need to use the restroom. (Pl's Mot. Summ J. 12).

An RFC assessment is based upon all of the relevant evidence. 20 C.F.R. §§ 404.1545, 41.945. It may include descriptions of limitations that go beyond the symptoms, such as pain, that are important in the diagnosis and treatment of Claimant's medical condition. Id. Observations made of the Claimant's limitations by treating physicians, psychologists, family, neighbors, friends or other persons may be used. Id. These descriptions and observations must be considered along with medical records in order to decide the extent to which an impairment keeps a Claimant from performing particular work activities. Id. When a Claimant's physical abilities are assessed, the ALJ first must assess the nature and extent of a Claimant's physical limitations, and will then determine a Claimant's RFC for work on a regular and continuing basis. 20 C.F.R. § 404.1545(b). This assessment is not a decision on whether a Claimant is disabled, but is used as the basis for determining the particular types of work a Claimant may be able to do despite her impairments. Id.

In this case, the record is fully and fairly developed on the issue of whether Claimant is able to work on a regular and continuous basis even with her urinary frequency and it is fully developed as to why the ALJ discredited Claimant's statements as to the frequency with which

she needs to use the restroom. Claimant testified that she suffered from urinary frequency, causing her to need to use the restroom every fifteen to twenty minutes after her hysterectomy and diagnosis with interstitial cystitis. However, the ALJ noted that Claimant testified her symptoms improved after beginning to take a medication called Elmiron, and the ALJ gave weight to this evidence. (Tr. 21). Additionally, although Claimant went to several doctors with various urinary problems, there is no evidence that the Claimant ever complained to her doctors about her need to urinate every ten to fifteen minutes, and with such an absence, the ALJ could discredit her testimony to the contrary. (Tr. 267, 317, 648). The ALJ also noted that Claimant's work part-time at a daycare center even prior to being prescribed Elmiron "supports her ability to work at the above described residual functional capacity which with the additional limitations fully accommodates her symptoms relating to this impairment." (Tr. 21). Accordingly, there was no need for the ALJ to factor a higher frequency of bathroom breaks into his RFC analysis. See Ramirez v. Astrue, 373 Fed. App'x. 709, 710 (9th Cir. 2010). The ALJ's decision as to Claimant's RFC and his determination that she could return to her past employment as a secretary or bookkeeper is thus supported by substantial evidence.

    2.    <u>Whether the ALJ Erred in Determining Claimant's Statements Concerning her Symptoms were not Credible</u>

Claimant contends the ALJ erred in concluding her allegations of subjective symptoms, including urinary frequency and migraine headaches, were not credible. The determination of whether a person is disabled by pain or other symptoms is a two-step process. First, the ALJ must expressly consider whether the claimant has demonstrated by objective medical evidence an impairment capable of causing the degree and type of pain alleged. <u>Craig v. Chater</u>, 76 F.3d

14

585 (4th Cir. 1984). Second, once this threshold determination has been made, the ALJ must consider the credibility of her subjective allegations of pain in light of the entire record. Id. Additionally, "[b]ecause hearing officers are in the best position to see and hear the witnesses and assess their forthrightness, we afford their credibility determinations special deference." See Nelson v. Apfel, 131 F.3d 1228, 1237 (7th Cir. 1997). This Court will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000)(quoting Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990)).

In this case, Claimant contends the ALJ's credibility finding was improper because it rests on boilerplate language instead of specific reasons for his finding on credibility. While it is true that boilerplate language has been condemned repeatedly by the courts, see Parker v. Astrue, 597 F.3d 920, 921-22 (7th Cir. 2010), there is no merit to the contention that the ALJ's opinion is merely perfunctory in this case. The ALJ concluded Claimant retained the ability to perform a limited range of light work, (Tr. 18), and prior to so concluding, the ALJ considered Claimant's subjective symptoms, and their impact on her work-related abilities. Id. He found that while Claimant suffered from medically determinable impairments capable of causing "some of the alleged symptoms," Claimant's statements as to the severity and frequency of her symptoms were not credible to the extent they are inconsistent with the RFC assessment. (Tr. 19). Here, the ALJ spent almost three full pages delineating evidence supporting his credibility finding. (Tr. 19-22). For example, he underlined the fact that Claimant was the primary caregiver for three children during this time period, and that she also volunteered to lead a group of forty-five Girl Scouts. (Tr. 19). His credibility determination resulted from a lengthy consideration of the

entire record, including medical evidence, hearing testimony, and her daily activities during the period in question (Tr. 19-22), so the ALJ did not commit error.

Additionally, although Claimant correctly cites Hines v. Barnhart for the proposition that after she has meet her "threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [she] was entitled to rely exclusively on subjective evidence to prove the second part of the test," 453 F.3d 559, 565, this is not a full and accurate statement of the law. The Court in Hines went on to state that "[w]hile objective evidence is not mandatory at the second step of the test, [t]his is not to say, however, that objective medical evidence and other evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work...Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with available evidence." Id. at 565 n. 3 (quoting Chater, 76 F.3d 585, 595 (4th Cir. 1996)). The ALJ in this case found that Claimant's testimony was inconsistent with available evidence, so the ALJ has not committed error.

Furthermore, Claimant contends that the ALJ relied on factors not supported in the record when assessing her credibility. Claimant contends that the ALJ improperly discounted her testimony regarding the severity of her migraines because she stopped taking depo-provera because of weight gain, when she claims she discontinued use because of fear of osteoporosis. Pursuant to Gross v. Heckler, 785 F.2d 1163, 1165-66 (4th Cir. 1986), symptoms that are reasonably controlled by medications are not disabling. Therefore, when assessing the impact of a claimant's symptoms on his or her ability to work, an ALJ may reasonably consider whether

16

the claimant has failed to comply with prescribed treatment for the symptoms. See 20 C.F.R. § 404.1530. Furthermore, Social Security Ruling 82-59 instructs that when a claimant has not complied with prescribed treatment, they "should be given an opportunity to fully express the specific reason(s) for not following the prescribed treatment. Detailed questioning may be needed to identify and clarify the essential factors of refusal. The record must reflect as clearly and accurately as possible the [claimant's] reason(s) for failing to follow the prescribed treatment. Individuals should be asked to describe whether they understand the nature of the treatment ... [and] should be encouraged to express in their own words why the recommended treatment has not been followed." SSR 82–59; Renneker v. Astrue, No. 1:10-cv-386, 2011 WL 2559515 at * 12 (S.D.Ohio April 4, 2011).

In this case, there was conflicting testimony in the record as to why Claimant stopped following her prescribed medication, (Tr. 283, 287, 301), so the ALJ, following the mandate of SSR 82-59, probed Claimant with questions at the hearing to try to determine what her reason was for not taking the prescription. When Claimant was asked why she was no longer on migraine medication, she stated that: "Because of all the different medications that they tried me on prophylactically, nothing was really working. It was causing me to gain weight." (Tr. 61). She continued by stating: "I don't want to take anything more that is going to cause the side effects or cause the weight gain." (Tr. 61). While her fear of osteoporosis may have also been a motivating factor, the ALJ has not committed error by according weight to her statement that she discontinued her use of depo-provera because of fear of weight gain.

Finally, Claimant contends that the ALJ improperly assessed Claimant's credibility because he considered evidence of her employment at a daycare center and as a babysitter to

17

discount her testimony regarding the severity of her headaches and urinary urgency. (Tr. 20-21). Claimant argues that it is improper to consider this as evidence of substantial gainful employment because the work activity was not significant enough to be considered gainful employment. (Pl.'s Mot. Summ. J. 14-15 ). However, the ALJ did not consider this work to determine whether it was gainful employment, he considered it in reference to whether Claimant's statements about her symptoms were credible. In making a credibility determination, the ALJ is supposed to consider "all of the evidence presented, including information about Claimant's prior work record." 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). This is what the ALJ did here so this Court cannot conclude that the ALJ has committed error.

For the above reasons, Claimant's assertions do not warrant relief.

## IV. Recommendation

For the foregoing reasons, I recommend that:

1. Claimant's Motion for Summary Judgment be DENIED.

2. Commissioner's Motion for Summary Judgment be GRANTED. The ALJ properly determined Claimant's residual functional capacity. Furthermore, the ALJ's credibility determination is supported by substantial evidence because it is not merely boilerplate and because it is based on factors that are supported by the record.

Any party who appears *pro se* and any counsel of record, as applicable, may, within ten (10) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should be submitted to the District Court Judge of Record. Failure to timely file objections to the Report

and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation.

<u>DATED</u>: August 31, 2011

                                           /s/ James E. Seibert
                                          JAMES E. SEIBERT
                                          UNITED STATES MAGISTRATE JUDGE